SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
AUTONATION, INC., a Delaware Corporation; JEFFREY DAVIS, an individual; WAYNE HUIZENGA, an individual; LKQ CORPORATION, a Delaware corporation; and DOES 1 - 25.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
James Carr, an individual

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

EL DORADO CO. SUPERIOR CT.

**FILED**    JUN 15 2017
J. Jimenez
BY _____
Deputy

HK
1478
06-27-17
3.33pm

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days  Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case  The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* |
|---|---|
| El Dorado County Superior Court<br>3321 Cameron Park Dr.<br>Cameron Park, CA 95682 | PC 20170275 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Meghan K. Woodsome
1482 East Valley Rd., Suite 632
Montecito, CA 93108

WOODSOME LAW
805-219-6047

| DATE: 6/15/2017 *(Fecha)* | Clerk, by *(Secretario)* | J. Jimenez | , Deputy *(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* AutoNation Inc, a Delaware Corporation
   under: ☒ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

ISSUED

Assigned to
Judge Warren C. Stracener
For all purposes

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] |  Essential Forms | **SUMMONS** | Page 1 of 1<br>Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|---|

James Carr

# AutoNation

JUN 2 7 2017

# Legal Department

Meghan K. Woodsome (SBN 272459)
WOODSOME LAW
mwoodsome@woodsomelaw.com
1482 East Valley Road Suite 632
Montecito, California 93108
Telephone:    (805) 219-6047
Fax:     .      (805) 969-7753

Kevin A. James, Esq. (SBN 285302)
BECKER & RUNKLE
kevin@kajameslaw.com
263 Main Street Level 2
Placerville, CA 95667-5541
Telephone:    (530) 295-6400
Fax:            (530) 295-6408

Attorneys for Plaintiff

**EL DORADO CO. SUPERIOR CT.**

**FILED**    JUN 15 2017
J. Jimenez
BY _____
Deputy

HK
1478
06-27-19
3:33pm

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

### COUNTY OF EL DORADO

JAMES CARR, an individual;

    Plaintiff,

vs.

AUTONATION, INC.; a Delaware corporation;
JEFFREY DAVIS; an individual;
WAYNE HUIZENGA; an individual;
LKQ CORPORATION; a Delaware corporation;
and
DOES 1–25,

    Defendants.

Case No.: **PC 20170275**

**VERIFIED COMPLAINT FOR DAMAGES**

1) **Misappropriation of Trade Secrets**
2) **Breach of Contract Implied in Fact**

**UNLIMITED CIVIL CASE**

**JURY TRIAL DEMANDED**

Assigned to
Judge Warren C. Stracener
For all purposes

VERIFIED COMPLAINT

Plaintiff James Carr ("Plaintiff") alleges the following against Defendants AutoNation, Inc. ("AutoNation"), Jeffrey Davis ("Davis"), Wayne Huizenga ("Huizenga"), LKQ Corporation ("LKQ") and Doe Defendants 1–25 ("Doe Defendants," and, collectively with AutoNation, Davis, Huizenga, and LKQ, "Defendants"), based, where applicable, on personal knowledge, information and belief, and the investigation and research of counsel. Any allegations of this Verified Complaint stated on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## I. INTRODUCTION

1.      Prior to the late 1990s, the automobile wrecking and recycling industry consisted of fragmented "mom-and-pop" operations scattered throughout the country with little to no coordination. The small operations comprising the industry during this time lacked the discipline and sophistication to coordinate their inventories to efficiently meet the national demand for used automobile parts. These small operations also lacked access to the capital needed to amass the inventory levels required to fuel high sales and thereby gain a competitive edge in the market. As detailed elsewhere in this Verified Complaint, in the absence of meaningful competition for any sort of coordinated, well-funded enterprise, Plaintiff correctly predicted that whoever first designed and implemented a winning strategy coupled with the capital necessary to rapidly acquire a critical mass of inventory was all but guaranteed to reap massive rewards.

2.      Between 1985 and 1995, Plaintiff owned and operated an automobile-wrecking business in Placerville, El Dorado County, California. Unlike many of his counterparts who lacked business acumen, Plaintiff was a college-educated certified public accountant who commenced his career with then-"Big Five" accounting firm Arthur Andersen before serving as corporate controller for a company traded on the New York Stock Exchange. During his 10 years in the automobile-wrecking industry (sometimes referred to herein simply as the "Industry"), Plaintiff developed a deep understanding of that business area. Plaintiff believed his understanding of the Industry to be among the best, if not the best, of anyone in the country. Based on this understanding, Plaintiff formulated a plan to revolutionize the Industry. He envisioned accomplishing for the Industry what Ray Kroc – credited with transforming McDonald's into the world's leading fast-food chain – had

2

accomplished for the hamburger industry.

3. On or around March 28, 1995, Plaintiff prepared a business plan (the "Business Plan"). The Business Plan distilled Plaintiff's decades of education, experience, and expertise into a concrete strategy for combining new technology with a skilled workforce and – importantly –an adequate infusion of capital to transform the then-fragmented Industry into an efficient, interconnected, and highly profitable system capable of synchronizing the supply of wrecked cars with the demand for recycled parts on a national level. A copy of that Business Plan is attached hereto as Exhibit A.

4. Having formulated the Business Plan, Plaintiff set out in search of a partner to provide the capital needed to bring his plan to fruition. In or about November 1995, Plaintiff sent letters to approximately 10 select companies and business people gauging their interest in receiving the Business Plan and other information about his proposal. Huizenga was among these initial recipients. Huizenga was a well-known figure; he then owned at least three professional sports teams, including the Miami Dolphins. And, like many, Plaintiff knew of Huizenga as the person responsible for revolutionizing the video rental, garbage collection, and car dealership industries by founding Blockbuster Video, Waste Management, and AutoNation, respectively. A copy of the letter dated November 29, 1995 that Plaintiff sent Huizenga giving an overview of his general idea and offering to send Huizenga a copy of the Business Plan if he was interested is attached hereto as Exhibit B.

5. Only two of Plaintiff's letters received a response. The first response was from Laidlaw Transportation ("Laidlaw"), a Canadian company. Laidlaw asked Plaintiff to send the Business Plan, which he did. Ultimately, Laidlaw mailed Plaintiff a letter indicating that it was not interested in pursuing the venture and, upon Plaintiff's request, returned the Business Plan.

6. The other response came from Huizenga via AutoNation, a company that Huizenga and others had founded after leaving Blockbuster. At some time between November 1995 and January 1996, Plaintiff heard back by phone from Jeff Davis, then in charge of procurement, reconditioning, and distribution for AutoNation.

3
VERIFIED COMPLAINT

7.    According to publicly available information, Huizenga founded AutoNation in 1995. Shortly after the time that Plaintiff was interacting with AutoNation, Davis, and Huizenga, AutoNation was purchased by Republic Industries, Inc., another Huizenga company. (See Sandler, Linda and Oscar Suris, "Some Fans Wonder if Huizenga is Overdoing His 'Self-Dealing,'" The Wall Street Journal (Mar. 26, 1997).) According to AutoNation's SEC form 10-K filed in March 1996, Huizenga had acquired millions of AutoNation shares valued in the tens of millions of dollars in or around summer 1995.

8.    During the telephone conversation between Davis and Plaintiff, Davis asked Plaintiff follow-up questions about the idea described in the November 29, 1995 letter. In a letter dated January 8, 1996, Plaintiff elaborated on some of the answers that he had given by phone to these questions and also, consistent with instructions received during that telephone conversation, enclosed a copy of the Business Plan. A copy of the letter enclosing the Business Plain is attached hereto as Exhibit C.

9.    On or around February 20, 1996, Davis traveled to California to meet with Plaintiff in person and tour approximately 5 automobile wrecking yards throughout Northern California. A copy of the itinerary from Davis' February 20, 1996 tour is attached hereto as Exhibit D. During that visit, Plaintiff spoke to Davis in general terms about next steps, including what the nature of his future involvement would be should they decide to move forward. The context of that conversation made clear that Plaintiff contemplated being compensated or otherwise involved should Huizenga, AutoNation, or any affiliates choose to move forward with the idea.

10.    Sometime thereafter, Davis called Plaintiff to communicate that Huizenga and AutoNation were not interested in proceeding. Plaintiff asked Davis to please return the Business Plan, which – like Laidlaw – Davis did. Plaintiff at that point was no longer working in the Industry. Having moved on to other ventures, he did not follow the Industry moving forward, nor did he keep in touch with those who worked in the Industry.

11.    In or around October 2015, Plaintiff learned for the first time that his idea was not dismissed at all. Over a casual conversation at a barbeque with a new acquaintance who owned a Northern California auto parts recycler, Plaintiff recounted the time he believed he had a billion-

dollar business idea and pitched it to Huizenga, and that Huizenga had gone so far as to send a representative to evaluate the idea. The friend was incredulous and told Plaintiff for the first time that indeed such a company – LKQ Corporation ("LKQ") – had been formed with Huizenga's involvement, and that it was tremendously successful.

12.    Since that conversation, Plaintiff has learned the following through his research and the research of counsel. According to publicly available documents, LKQ – an acronym for "like kind and quality" – is a Chicago-based company that was founded in 1998 by the late Donald Flynn, a former Waste Management Senior Vice President and Chief Financial Officer. Flynn had supposedly been in search of a fragmented industry to consolidate in the same way that Huizenga had with the garbage collection business. (http://www.fundinguniverse.com/company-histories/lkq-corporation-history/). Huizenga, Dean Buntrock – who like Flynn had been a major player in several of Huizenga's other business enterprises, including Waste Management – and AutoNation were founding backers.

13.    The lines between Huizenga, his Waste Management team, AutoNation, and LKQ were highly porous. For example, according to publicly available documents, Plaintiff's research has indicated that at least 7 former Waste Management Executives would go to work for LKQ. In 2002, the Securities & Exchange Commission ("SEC") filed a Complaint alleging "massive financial fraud motivated by greed and a desire to preserve professional and social status" during the 1992–1997 time period. Former Waste Management CEO Dean Buntrock – who, with Huizenga, provided LKQ with much of its start-up money – was identified by the SEC as a driving force in the fraud allegations, which were eventually settled for $30.87 million without an admission of wrongdoing. And as one news report described it, Flynn jumped ship from Waste Management at a time when the accounting irregularities in that company were starting to surface. "Looking for his next act," Flynn, a "Huizenga pal," founded LKQ. ("LKQ collides with Huizenga curse as margins dent," Michelle Celarier, *The New York Post* (Apr. 19, 2014).) "Huizenga helped out Flynn (who died in 2011) with an investment from AutoNation." (*Id.*)

14.    Similarly, AutoNation was a major early investor in LKQ. According to LKQ's S-1 Registration Statement, it was LKQ's largest shareholder at the time of its initial public offering

("IPO"), and was also a major customer. At least one key employee also straddled LKQ and AutoNation. Jonathan Ferrando, who according to public filings joined LKQ as a director in 2000, served as Senior Vice President, General Counsel, and Secretary for AutoNation.

15.    According to publicly available documents, LKQ commenced its operations with the buying of automobile salvage yards. As Plaintiff had predicted, it faced little competition for the first several years of its existence and was able to move rapidly in making acquisitions to establish a network that, according to its IPO documents, would be difficult to replicate. Indeed, Plaintiff's predictions were remarkably accurate. He foresaw LKQ achieving national market dominance, 60 facilities, and gross revenues of $500 million in its first 5 years. According to a late 2000 article in the Amarillo Globe News, LKQ was right on schedule roughly 2.5 years after its founding with 43 facilities and revenues of $225 million. (http://amarillo.com/stories/091700/bus_junkyard.shtml#.WKSkohRbXT5.) Also following the blueprint Plaintiff had laid out, LKQ's expansion focused on establishing presence in metropolitan areas. Plaintiff's Business Plan – in addition to his January 8, 1996 letter to Jeff Davis in response to questions raised by Jeff Davis in a prior telephone conversation – also contemplated that expansion would ideally touch upon major population centers.

16.    According to publicly available documents, LKQ was "the first recycler of automotive products to achieve a national network and presence." (LKQ S-1 Registration Statement, at 44.) On information and belief, this gave LKQ a competitive edge as significant interest in consolidating the auto-recycling industry emerged in the late 1990s. Most notably, Ford Motors launched its own enterprise – Greenleaf Acquisitions – in mid 1999, over a year after LKQ commenced operations. By the time Ford entered the industry, LKQ had already acquired 44 yards and established a national presence. LKQ would later cite the difficulty that competitors would have in replicating its national network as a competitive advantage. As Plaintiff said in his Business Plan, "[o]nce a large company comes into the market imitators will surely follow. A head start is a big advantage, however." (Business Plan, at Appendix-6.)

17.    According to publicly available documents, LKQ underwent an IPO in 2003. At the time of the IPO, AutoNation owned 1.378 million shares in LKQ comprising just under 10% of

LKQ's ownership (LKQ had repurchased 1,878,684 shares from AutoNation prior to the IPO). In the same year as the IPO, Auto Nation sold its remaining stake in LKQ for $38.3 million, which resulted in a pretax gain of $16.5 million.

18. According to publicly available documents, LKQ currently has a market capitalization of approximately $8.92 billion (as of April 21, 2017 according to Yahoo! Finance) and, for the year ended 2016, had net income of approximately $463 million.

## II. PARTIES

19. Plaintiff James Carr is a businessman and entrepreneur. Plaintiff was at all relevant times and continues to be a resident of California. At the time of the conduct alleged in this Verified Complaint, he was a resident of El Dorado County, California.

20. Defendant AutoNation, Inc. is a Delaware Corporation having its principal place of business in Fort Lauderdale, Broward County, Florida.

21. Defendant Jeff Davis is an individual who, on information and belief, resides in Jacksonville, Duvall County, Florida. He no longer works for AutoNation, though his biography on the website of the capital management company that he subsequently started credits him with having co-founded AutoNation.

22. Defendant LKQ Corporation is a Delaware Corporation having its principal place of business in Chicago, Cook County, Illinois.

23. Defendant Wayne Huizenga is a businessman and entrepreneur. His more notable business ventures include Waste Management, Inc., Blockbuster Video, and Auto Nation. He has also owned – in whole or in part – several professional sports teams in Florida. On information and belief, Huizenga is a resident of Fort Lauderdale in Broward County, Florida. On information and belief, Huizenga instructed Davis to reach out to Plaintiff, known to be a California resident, to obtain the Business Plan and other related information and, later, to travel to California to meet with Plaintiff and learn more about Plaintiff's concept.

24. The Doe Defendants are individuals whose identities are not yet known, but who participated or otherwise abetted Defendants' misappropriation of the substance of Plaintiff's Business Plan.

7

VERIFIED COMPLAINT

### III. JURISDICTION AND VENUE

25.    Defendants are subject to specific jurisdiction in California. With the exception of LKQ, Defendants purposely chose to interact with Plaintiff, a California resident located in California, by having their agent, Davis, (a) respond to Plaintiff's communications – which had Plaintiff's home address printed prominently in the header – (b) encourage Plaintiff to provide his Business Plan and further information, and (c) travel to California to meet with Plaintiff in person and have Plaintiff take Davis on a tour of various California facilities and provide information that further assisted Defendants in misappropriating Plaintiff's concept. They then all enriched themselves by using an idea that was taken from a California resident. By taking such actions directed towards Plaintiff and California, Defendants purposefully availed themselves of California's benefits. *See Magnecomp Corp. v. Athene Co.*, 209 Cal. App. 3d 526, 531 (1989) (finding jurisdiction over Japanese company whose agent stole trade secrets from California resident); *see also Snowney v. Harrah's Entertainment, Inc.*, 35 Cal. 4th 1054, 1062 (2005). This controversy arises out of Defendants' conduct with the forum, when their agent came to California to steal Plaintiff's Business Plan and related information. *Id.*

26.    And the Court's exercise of jurisdiction is both fair and just in this case. With the exception of Davis – who physically traveled to California and had multiple communications with Plaintiff in California – all Defendants have had extensive business interests in California. AutoNation's and LKQ's contacts are discussed in Paragraph 27, below. Huizenga has a similarly long-running and significant relationship with California. Both Blockbuster and Waste Management had an extensive presence throughout California. And Republic Industries, Inc., which owned AutoNation at the time of the misappropriation, had a significant presence in California and was licensed to do business in that state between 1992 and 2000. According to its March 1996 10-K, two of its thirteen landfills were located in California, and its waste collection activities centered largely around its landfills.

27.    Moreover, AutoNation and LKQ are subject to general jurisdiction in California. According to its Form 10-K filed with the Securities & Exchange Commission for the year ending December 31, 2015, AutoNation operated 41 stores and had 54 franchises in California in 2015.

8
VERIFIED COMPLAINT

According to that same filing, California accounted for 18% of AutoNation's revenue in 2015, making California one of its top three sources of revenue. AutoNation's extensive California presence constitutes substantial, continuous, and systematic contact in California sufficient to support a finding of general jurisdiction.

28.    Similarly, LKQ – financed in large part by Huizenga and AutoNation – expanded quickly into California. By the time of LKQ's first public filings in connection with the 2003 IPO, it had operations in four California regions. According to its website, LKQ today has hundreds of locations within California. LKQ's connection with California is substantial, continuous, and systematic in nature such to confer general jurisdiction.

29.    California has an interest in protecting its individual citizens like Plaintiff from large corporations and powerful individuals stealing trade secrets and intellectual property.

30.    Venue in the California Superior Court for El Dorado County is proper because a significant portion of the events giving rise to the allegations in this Complaint took place in this county. Plaintiff resided in El Dorado County at all times relevant to this Complaint. His correspondence to Defendants prominently displayed his address, and it was while he was located in this county that Defendants chose to interact with him and – most importantly – instructed him to transmit the Business Plan. Moreover, as no Defendant resides in California, Plaintiff may elect the county in which he files. *See* Cal. Civ. Proc. Code § 395(a). And, with regard to Plaintiff's second cause of action for breach of contract implied by fact, El Dorado is the county in which Plaintiff entered into his implied agreement with Huizenga and AutoNation (via Jeff Davis). *Id.*

### IV. STATUTE OF LIMITATIOMS

31.    Plaintiff did not actually learn of the conduct alleged herein until October 2015.

32.    Plaintiff had no reason to suspect Defendants had indeed pursued Plaintiff's plan without his knowledge. Plaintiff was an individual that cold-contacted a business mogul hoping to pitch a business idea. It was entirely reasonable for him to believe Defendants' agent that Defendants – like Laidlaw and the companies who did not respond at all – had simply decided not to pursue the idea. At no time prior to his actual discovery of Defendants' conduct in 2015 was he put

9
VERIFIED COMPLAINT

on inquiry notice of Defendants' misappropriation. *See Uniram Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 946 (C.D. Cal. 2007).

33. In addition to not having any notice of wrongdoing, the efforts that Plaintiff would have had to undertake to learn of Defendants' conduct sooner would have exceeded reasonable diligence. On information and belief, LKQ was formed under a different name than any individual or entity that Plaintiff dealt with when he initially pitched his idea. Moreover, the company was given a non-descript acronym for a name that, unlike Huizenga's other ventures (*e.g.*, Blockbuster, Waste Management, AutoNation) did not clearly convey the nature of the company's business.

34. The LKQ IPO did not occur until 2003, and Plaintiff did not know – nor through reasonable diligence should he have known – about that. It occurred eight years after he had launched his idea to Defendants, under a corporation name of which Plaintiff was entirely ignorant.

35. Moreover, LKQ is not an especially well-known company outside of the auto-wrecking and related industries. On information and belief, LKQ did not have a website until 1999; over three years after Plaintiff's interactions with Defendants, and even then it did not mention any of the individuals or entities that Plaintiff had previously dealt with. Information in general was not as readily available via the Internet when Plaintiff pitched his ideas to Defendants and in the years that followed. For perspective, according to Google's website, it did not even launch its Search platform until 1998, at which time it still operated out of a garage. (https://www.google.com/about/company/history/).

36. According to Plaintiff's research, LKQ was not listed on the S&P 500 until approximately May 2016. Prior to that, it was just one of over 3,000 companies listed on the Nasdaq – the largest stock exchange in the United States – hiding behind a name that gives away nothing about its business model. In a Motley Fool column, Alex Dumortier, a Certified Financial Analyst who authors a twice-daily column on investing in the stock market, noted that he first learned of LKQ on May 20, 2016 from a press release announcing LKQ's inclusion in the S&P 500. (http://www.fool.com/investing/2016/05/24/investors-should-get-to-know-the-newest-stocks-in.aspx).

10
VERIFIED COMPLAINT

37. Even if Plaintiff were monitoring Defendants, it is unlikely he would have learned about LKQ. At the time of drafting this Verified Complaint, LKQ was not mentioned on Huizenga's Wikipedia page. Nor does any mention of it come up in any page on the first page of Google Search results after searching "Huizenga." Indeed, if Plaintiff had been monitoring the Wall Street Journal in the years following his pitch to Defendants, he would have been led to believe that Huizenga had not pursued his plan after reading a 1997 WSJ article running through several of Huizenga's recent business activities and not mentioning a company fitting the definition of LKQ. (https://www.wsj.com/articles/SB859325467839507500). A decade later, he would have been further assured by a feature on Entrepreneur.com profiling Defendant's various business ventures – including AutoNation – and not mentioning LKQ or any activity in the auto-wrecking industry. (https://www.entrepreneur.com/article/197648).

## IV. CAUSES OF ACTION

### First Claim for Relief
### Misappropriation under California Uniform Trade Secret Law (Cal. Civ. Code §§ 3426 *et seq.*)
### (By Plaintiff against all Defendants)

38. Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated herein.

39. AutoNation and Huizenga are liable both for their own conduct and also for that of their agent, Davis, whose interactions with Plaintiff were undertaken within the scope of his employment with AutoNation and at the direction of Huizenga, who then controlled AutoNation.

40. The Business Plan conveyed multiple trade secrets. In addition to Plaintiff's overarching premise, derived from his years of experience and education in both the auto-wrecking and financial industries, that a substantial and early investment of capital would be the key to cornering the auto-wrecking industry, Plaintiff's Business Plan conveyed the following techniques, and processes (collectively, the "Business Plan Trade Secrets"):

    a) Investing in the employment of educated and talented managers and salesmen at a higher level than those typically used by pre-LKQ wrecking yards, including suggested background for sales people (college graduates), feedback from his

11
VERIFIED COMPLAINT

own experience attempting to develop sales associates, and a staffing source for managers. (Business Plan, at 2.)

b) Sourcing dismantling personnel from car dealer service departments given the similarity of the work; with an instruction that pay would need to be competitive to that of the dealerships; significantly more than the prevailing wage in the auto-wrecking industry at the time. (*Id.*)

c) A discussion of the competitive advantage to be gleaned from the ability to amass significant inventory quickly. (*Id.*)

d) The need for a central, computerized inventory system capable of monitoring sales of particular parts and the extent of the competitive advantage that such a system would provide given that fewer than 500 of 16,000 yards had any sort of computerized system and the vast majority of those were not being used efficiently. (*Id.* at 3–4)

e) Instructions for focusing on matching inventory with demand for rapid profit rather than low cost inventory which, based on the practices of insurance companies, may be in very low demand. (*Id.*)

f) The market dynamics that create a significant profit motive for focusing on high cost vehicles. (*Id.* at 4.)

g) A step-by-step description of the progression of a standard customer call under the inefficient, then-prevailing industry standards juxtaposed to a step-by-step description of the more streamlined system for managing customer calls that would be available under Plaintiff's system. (*Id.* at 5.)

h) An explanation rooted in market realities of how a commission-based sales compensation model would eliminate some existing inefficiencies. (*Id.* at 6.)

i) Specific instructions as to the location and number of yards that would need to be acquired or created. (*Id.*)

j) A description based on size and inventory allocation of the ideal wrecking facility and how the areas allocated to specific inventory classes should be arranged. (*Id.*

12

VERIFIED COMPLAINT

at 7.)

k) Instructions as to the safe handling of hazardous liquids. (*Id.*)

l) Specific instructions as to how to price inventory on resale. (*Id.*)

m) The consumer power of insurance companies. (*Id.* at 8.)

n) Factors for the computer program to consider in evaluating inventory purchases. (*Id.* at 9.)

o) The ability to recondition certain high demand parts from automobiles offering more holistic value to those with more individualized part needs, which Plaintiff expressly noted was not common knowledge in the industry. (*Id.* at 10.)

p) The potential for a spin-off market for reconditioned parts. (*Id.* at 11.)

q) Flagging risk of environmental contaminants in acquired yards. (*Id.*)

r) Keying the growth plan to major metropolitan marketing areas. (January 8, 1996 letter from Carr to Davis; Business Plan at 6.)

41.    The Business Plan Trade Secrets derived potential economic value, rooted in Plaintiff's years of work and investment in the auto-wrecking industry, from not being generally known to anyone but Plaintiff and to the limited few to whom he disclosed the Business Plan on request and under the implicit understanding that he would be compensated should the plan move forward. That economic value was realized when LKQ was indeed the first company to implement an effective business strategy in the Industry; a competitive advantage that has allowed it to dominate the Industry to this day.

42.    Plaintiff undertook measures that were reasonable under the circumstances of an independent, unknown entrepreneur approaching business moguls and large corporations. He did not disseminate his Business Plan unsolicited. Rather, he waited for those that he had approached to request the Business Plan and, consequently, only sent the Business Plan to two recipients. Given the significant imbalance of bargaining power between Plaintiff and the Business Plan recipients, Plaintiff feared that requesting a non-disclosure agreement would prematurely chill his communications with those recipients. Moreover, Plaintiff believed the circumstances made clear to the recipients that their receipt of the Business Plan and Plaintiff's further input and expertise was

13

conditioned upon their agreement not to use or further disclose the Business Plan without Plaintiff's consent. Plaintiff sought to further protect his Business Plan and confirm the parties' understanding that Defendants were not to use its contents without involving or compensating Plaintiff when he requested recipients return the Business Plan following their respective decisions not to move forward.

43. Defendants used and disclosed the Business Plan Trade Secrets when they and others designed and founded LKQ. Indeed, Plaintiff's Business Plan can be seen in LKQ's early filings and press releases. The following are a few examples that illustrate how Plaintiff's Business Plan guided LKQ in its infancy:

| Plaintiff's Business Plan | LKQ Securities Registration Statement |
|---|---|
| "The auto dismantling industry in the USA is composed of 16,000 wrecking yards doing annual sales volume of $5 billion (US): that's $300,000 per yard. The largest yard does annual volume of $9,000,000; there are no significant multi-yard operators." (Business Plan, at 1.) | "We estimate that there are more than 6,000 automotive recyclers in the United States. We believe approximately 93% of automotive recycling business have less than $3.00 million of annual revenue and approximately 50% have less than $0.5 million of annual revenue." (LKQ S-1, at 91.)<br><br>"The automotive recycling industry is highly fragmented, with very few multi-unit operators." (LKQ S-1, at 42.) |
| "A company with the resources can build a business from scratch, without acquisitions, with revenues of $250,000,000 to $500,000,000 within 5 to 7 years. This business can easily generate 20% to 25% pretax on sales, and, since the capital requirements are relatively modest, the rate of return is high." (Business Plan, at 1.) | "For the year ended December 31, 2002 and for the six months ended June 30, 2003, we reported revenue of $287.1 million and $160.3 million [approximately $320 million, annualized], respectively." (LKQ S-1, at 2.) |
| "The industry is on the verge of a technological revolution. The first organization to recognize this and provide the capital and the management expertise will quickly become the dominant force with a market share of 20% to 50%." (Business Plan, at 1.) | "We believe we were the first recycler of automotive products to achieve a national network and presence." (LKQ S-1, at 46.)<br><br>"We believe our national network would be difficult to replicate and provides us a competitive advantage." (LKQ S-1, at 46.) |
| "What can we do that isn't already being done? Bring in modern, | "A significant factor in our success has been our ability to implement best practices |

14
VERIFIED COMPLAINT

| | |
|---|---|
| sophisticated management methods that are routine in other industries but that haven't yet been applied to Auto Dismantling." (Business Plan, at 12.)<br><br>"It is difficult to convey the backwardness that is inherent in this industry today. These principles seem so obvious that the reader would assume that everyone would follow good business practices. But the opportunity exists because this industry is very primitive." (Business Plan, at 4.) | utilizing professional management techniques and disciplines in an industry characterized by small companies with limited resources." (LKQ S-1, at 45.) |
| "Inventory must be purchased based on a systematic analysis of sales and costs. This is straightforward with the computer systems available." (Business Plan, at 3.) | "We have developed centralized systems and methodologies that we believe give us competitive advantages in procuring an attractive mix of recycled OEM products from auctions. These systems and methodologies allow us to identify and value the parts on a damaged vehicle at auction that can be recycled and to rapidly determine the maximum price we can pay for the vehicle in order to achieve our target margins on resale of the recycled OEM products." (LKQ S-1 at 2.) |
| "One computes a bid for a vehicle by considering:<br>1. Current inventory level – do we need any of these parts?<br>2. Strength of current market demand for the good parts remaining on the vehicle.<br>3. Selling prices of the good remaining parts." (Business Plan, at 9.) | "We have developed centralized systems and methodologies that we believe give us competitive advantages in procuring an attractive mix of recycled OEM products from auctions. These systems and methodologies allow us to identify and value the parts on a damaged vehicle at auction that can be recycled and to rapidly determine the maximum price we can pay for the vehicle in order to achieve our target margins on resale of the recycled OEM products. We focus on disciplined purchasing by balancing our regional inventory levels with forecasted demand and limiting our bids to provide profitable targeted margins. We seek to optimize the prices for our products by regularly analyzing such factors as recent demand, inventory quantity and new OEM part prices. Through our nationwide system of regional facilities, we believe we are uniquely positioned to provide a broad and deep range of cost effective products and services to our customers." (LKQ S-1 at 2.) |

15

VERIFIED COMPLAINT

| | |
|---|---|
| | "The bid specialists analyze the data in light of current demand for the parts in question, the levels of our inventory with respect to such parts, and the projected margins expected for each vehicle. The specialists then set a maximum bid price which our bidders use to purchase the vehicle at auction. We believe that this system provides a disciplined approach for procurement." (LKQ S-1, at 47-48.) |
| "Sales in the wrecking industry are entirely driven by the level of inventory. This is a remarkable situation. No outside salesmen are needed and very little or no advertising." (Business Plan, at 3 (underlining in original).)<br><br>"[A]lmost no one operates at this level because nobody in the industry has the capital to employ $1,000,000 [the optimum per-yard minimum] in inventory." (Business Plan, at 3.) | "The inventory base of each of our facilities, supplemented by the inventory sharing system within our regional trading zones, gives us what we believe to be a competitive advantage through our ability to meet our customers' requirements more frequently than smaller competitors." (LKQ S-1, at 49.)<br><br>"We believe that our customers place a high value on availability of high quality recycled OEM products. We have therefore invested significant capital in our inventory and we have developed six regional trading zones, within which we make our inventory available to all of our local facilities." (LKQ S-1, at 47.) |
| It is absolutely imperative that the perpetual inventory be maintained accurately. In order to accomplish this, each vehicle must be inventoried when it arrives and this inventory must be coordinated with the dismantling process. Very few yards do this although it only takes about an hour per vehicle." (Business Plan, at 4.)<br><br>"The dismantler then takes those good parts off the vehicle, as directed, and puts them into the warehouse. The hulk and the broken parts are discarded. The computer inventory then allows the parts to be sold in much the same way that any new parts are sold." (Business Plan, at 7.) | "Vehicle processing involves converting a salvage vehicle into recycled OEM products ready for delivery. When a salvage vehicle arrives at one of our facilities, and inventory specialist identifies, catalogs and schedules the vehicle for dismantling." (LKQ S-1, at 51.)<br><br>"Each inventory item is entered into our inventory tracking system, inspected for quality, tagged for identification and prepared for storage and delivery to our customers. Mechanical products not in a condition to be sold as recycled products or that are in surplus supply are separated and sold in bulk to parts remanufacturers. The remaining vehicle hulks and components such as fabrics, rubber, plastics and glass are delivered to automobile shredders, crushers and scrap processors." (LKQ, S-1 at 48.) |
| "The [two] preprogrammed computer systems available are just excellent in | "We use widely available third-party systems technology, including one of the three facility |

16

VERIFIED COMPLAINT

| | |
|---|---|
| this area but it requires discipline, foresight and management to make certain that the integrity of the system is maintained." (Business Plan, at 4.) | management systems available to the automotive recycling industry, as well as some proprietary applications." (LKQ S-1, at 51.) |
| "Paying salesmen commissions is a way to make them productive. Many calls in auto wrecking are nuisance calls; for example, the caller wants a $5 headlight ring. We want to discourage the salesmen from wasting time on that unprofitable transaction and encourage them to spend time on higher dollar sales. Commission sales will accomplish this objective." (Business Plan, at 6.) | "Most of our sales personnel are paid primarily on a commission basis." (LKQ S-1, at 26.) |
| "It has been my observation that the industry largely employs those in the bottom quartile of mental ability. These people are typically not comfortable using computers and automotive manuals and therefore do not take advantage of the tremendous resources available. . . . The company must generally recruit and train its salesmen and managers rather than selecting from those already employed in the industry." (Business Plan, at 2–3.) | "The number and quality of our sales force is critical to our ability to respond to our customers' needs and increase our sales volume. We are continually evaluating our sales force, developing and implementing training programs and utilizing appropriate measurements to assess our selling effectiveness." (LKQ S-1 at 26.) |
| "While the possibility exists of shortening the lead time to start the test facility by acquiring an existing facility there are 2 main concerns that must be addressed. *The first is the possible liability for soils contamination.*" (Business Plan, at 11 (emphasis added).) | *"Our acquisition strategy has been to target companies with strong management teams, a record of environmental compliance,* solid growth prospects and a reputation for quality and customer service." (LKQ S-1, at 2 (emphasis added).) |
| "Pollution and hazardous waste spills are a way of life in the business now primarily because of lack of facilities planning and systems. The correct approach is to isolate all fluid draining to a specific roofed area with a concrete floor protected by curbs and catch drains. All vehicles would be processed through this area as part of the dismantling process so that by the time a vehicle was taken into the yard for inventory storage there will be no fluids remaining to leak. All these fluids | "We have made and will continue to make capital and other expenditure relating to environmental matters. We have an environmental management process designed to facilitate and support our compliance with these requirements." (LKQ S-1 at 58.) |

VERIFIED COMPLAINT

including gasoline, diesel fuel, Freon, anti-freeze, power steering fluid, oil, and brake fluid would then be properly and legally disposed of or recycled. This is an area where your Company's expertise will be invaluable. With history is (sic) a guide, one can predict that the development of more and more sophisticated pollution controls will make that aspect of the business ever more expensive and lead to a shaking-out of weaker competitors, leaving the industry to be shared by a few large, well-capitalized corporations." (Business Plan, at 7.)

44.    At the time of this use and disclosure, Huizenga, Davis, and AutoNation knew or had reason to know their knowledge of the Business Plan Trade Secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use. Plaintiff did not send the Business Plan unsolicited; he contacted Huizenga to determine whether he wanted to learn more about his plan and Davis responded on Huizenga's and AutoNation's behalf, asked follow-up questions, agreed to accept Plaintiff's Business Plan, and traveled to California to have Plaintiff take him on a tour of 5 auto dismantling facilities during which time they discussed what Plaintiff's role in any project using the Business Plan Trade Secrets would be. Under these circumstances, Huizenga, Davis, and AutoNation knew or had reason to know that they were only privy to the Business Plan Trade Secrets based on the understanding that Plaintiff would receive some compensation – or at least be involved – if those three Defendants were to use or further disclose the Business Plan Trade Secrets.

45.    Defendant LKQ acquired Plaintiff's trade secrets – either the Business Plan itself or its contents – knowing or with reason to know that they were acquired through improper means. On information and belief, none of the key executives who participated in the February 1998 founding of LKQ – Huizenga, Flynn, Buntrock – had experience in the auto-wrecking industry. Indeed, according to publicly available documents, LKQ did not make its first acquisition until almost six months after its founding in July 1998. Yet somehow they knew to look to this industry and they

18
VERIFIED COMPLAINT

knew – without any experience – how to implement a winning business model.

46.    For Defendants' misappropriation, Plaintiff is entitled to all remedies available at law and equity, including lost profits, disgorgement of Defendants' unjust enrichment from misappropriating the Business Plan Trade Secrets, or, if neither can be calculated, for a reasonable royalty for the time during which the Business Plan Trade Secrets remained unknown to the broader public.

47.    Huizenga's, AutoNation's, and various Doe Defendants' conduct was willful and malicious. They solicited the Business Plan Trade Secrets and Plaintiff's further expertise from him knowing he expected to benefit from any subsequent use and then, after telling him they were not going to proceed and complying with his request to return the Business Plan, Defendants started a company in an unrecognizable name in a different state under circumstances in which Plaintiff would – and indeed did – have no way of finding out about their misappropriation until decades later. Plaintiff therefore seeks exemplary damage of double any amounts otherwise awarded under this claims along with attorney's fees and costs.

**Second Claim for Relief**
Breach of Contract Implied By Fact (Cal. Civ. Code § 1621)
(By Plaintiff Against Defendants AutoNation and Huizenga)

48.    Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated herein.

49.    Plaintiff offered to share his Business Plan with Defendants under such circumstances that both sides would have understood Plaintiff expected compensation if his idea was used. Plaintiff did not just mail a copy of the Business Plan; he asked Huizenga if he would like to review it. Plaintiff transmitted the Business Plan to Davis only after he was asked to do so. Through Davis, their agent, Huizenga and AutoNation accepted the terms of Plaintiff's offer to provide the Business Plan when they instructed him to transmit the Business Plan and had Davis obtain more information by phone and an in-person visit to California. Plaintiff further clarified his expectations when he discussed his role in any business that grew out of the Business Plan with Davis.

50.    Defendants gave further affirmation to Plaintiff's understanding by informing Plaintiff that they would not be pursuing the business contemplated in the Business Plan and

19
VERIFIED COMPLAINT

returning Plaintiff's Business Plan upon request.

51.    This action is timely as it is commenced within two years of Plaintiff's October 2015 discovery of Defendants' breach of this agreement, which occurred in secret and under circumstances that would not have been discoverable to Plaintiff using reasonable diligence. *See NBC Universal Media, LLC v. Superior Court*, 225 Cal. App. 4th 1222, 1234 (2014); *April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 832 (1983).

52.    For Defendants' breach of this implied agreement, Plaintiff is entitled to all remedies available at law and equity, including compensation and disgorgement of profits. *See Dunkin v. Boskey*, 82 Cal. App. 4th 171, 198 (2000)

## VII. PRAYER

Plaintiff requests judgment against Defendants as follows:

53.    For all damages available under California Civil Code Section 3426.3 including actual damages in the form of lost profits in excess of $87,000,000 based on approximately 1% of LKQ's present market capitalization (Plaintiff does not concede 1% would necessarily be sufficient but asserts would have been the minimum share in the business he would have been afforded had Defendants acquired the Business Plan Trade Secrets through proper means) and/or disgorgement of Defendants' unjust enrichment from misappropriating the Business Plan Trade Secrets in the appropriate portion – to be established at trial – of the more than $2.68 billion in net profits that Defendants have collectively derived from their misappropriation of LKQ (1% of which would be $26.8 million).

54.    For exemplary damages under California Civil Code Section 3426.3(c) in an amount of double the amount awarded under Paragraph 53, above.

55.    For attorneys' fees and costs under California Civil Code Section 3426.4.

56.    For costs under California Code of Civil Procedure Section 1032(b);

57.    For both pre-judgment and post-judgment interest on any amounts awarded in the maximum amount available by law;

58.    For Defendants to be held jointly and severally liable; and

20
VERIFIED COMPLAINT

59.    For such other and further relief as the Court deems proper.

[Signature Page on Next]

21
VERIFIED COMPLAINT

DATED:  June 9, 2017                              Respectfully submitted,

                                                  By: _____
                                                      Meghan K. Woodsome, Esq.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  June 9, 2017

                                                  By: _____
                                                      Meghan K. Woodsome, Esq.

22
VERIFIED COMPLAINT

## VERIFICATION

I, James Carr, am the Plaintiff in the above-titled action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Signed on this third day of May 2017 in Santa Barbara, CA.

_____

James Carr, Plaintiff

VERIFICATION

CM-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Meghan K. Woodsome (SBN 272459)<br>Woodsome Law<br>1482 East Valley Road Suite 632<br>Montecito, CA 93108<br>TELEPHONE NO.: (805) 219-6047    FAX NO.: (805) 969-7753<br>ATTORNEY FOR (Name): Plaintiff James Car | **FOR COURT USE ONLY**<br><br>**EL DORADO CO. SUPERIOR CT.**<br><br>**FILED** JUN 15 2017<br><br>BY ___J. Jimenez___<br>Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF El Dorado
STREET ADDRESS: 3321 Cameron Park Drive
MAILING ADDRESS:
CITY AND ZIP CODE: Cameron Park, CA 95682
BRANCH NAME: Cameron Park Branch

CASE NAME:
Carr v. AutoNation, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☑ Unlimited ☐ Limited<br>(Amount (Amount<br>demanded demanded is<br>exceeds $25,000) $25,000 or less) | ☐ Counter ☐ Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **PC  20170275**<br><br>JUDGE: Assigned to<br>DEPT: Judge Warren C. Stracener<br>For all purposes |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☑ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☑ monetary  b. ☐ nonmonetary; declaratory or injunctive relief  c. ☑ punitive
4. Number of causes of action (specify): 2
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: June 9, 2017

Kevin A. James (SBN 285302)
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Page 2 of 2

Meghan K. Woodsome (SBN 272459)
WOODSOME LAW
mwoodsome@woodsomelaw.com
1482 East Valley Road Suite 632
Montecito, California 93108
Telephone:    (805) 705-6234
Fax:          (805) 969-7753

Kevin A. James, Esq. (SBN 285302)
BECKER & RUNKLE
kevin@kajameslaw.com
263 Main Street Level 2
Placerville, CA 95667-5541
Telephone:    (530) 295-6400
Fax:          (530) 295-6408

Attorneys for Plaintiff

EL DORADO CO. SUPERIOR CT.

FILED    JUN 19 2017

BY **VECHTOMOV**
Deputy

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF EL DORADO

| | |
|---|---|
| JAMES CARR, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>AUTONATION, INC.; a Delaware corporation;<br>JEFFREY DAVIS; an individual;<br>WAYNE HUIZENGA; an individual;<br>LKQ CORPORATION; a Delaware corporation;<br>and<br>DOES 1–25,<br><br>Defendants. | Case No.: PC20170275<br><br>**NOTICE OF ERRATA TO COMPLAINT**<br><br>Judge: Hon. Warren C. Stracener<br><br>Date Action Filed: June 15, 2017 |

NOTICE OF ERRATA

TO THE HONORABLE COURT AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Plaintiff JAMES CARR hereby respectfully submits this Notice of Errata relating to the complaint in the above-entitled action ("Complaint").

Due to an oversight, Exhibits A through D, referenced in the body of the Complaint, were inadvertently omitted from the Complaint filed on June 15, 2017. Exhibits A through D, as referenced in the Complaint, are attached hereto as Exhibits "A" through "D" and are incorporated into the Complaint by reference.

DATED: June 19, 2017

Respectfully submitted,

By: _____
    Kevin A. James, Esq.

---

2
NOTICE OF ERRATA

**EXHIBIT   A**

# Auto Dismantling

## A Business Plan

By: Jim Carr

March 28, 1995

## Auto Dismantling
### Index

1.      Industry Overview
2.      Keys to Success in Auto Dismantling
    A.      Personnel
    B.      Capital
    C.      Computers
    D.      Inventory Buying
    E.      Inventory Control
    F.      Repeatable System
    G.      Cost Control
3.      Business Strategy
4.      Facilities and Pollution Control
5.      The Assembly Line
6.      Pricing
7.      Case Study
8.      Auction Buying Strategy
9.      Research and Development
10.      Capital Requirements, Payback Period, & Return on Investment
11.      Projected Startup Costs
12.      Summary

### Appendix

1.      Optimum Yard Projected Financial Information
    A.      Optimum Yard Projected Income Statement
    B.      Optimum Yard Projected Sales and Cost of Sales
    C.      Optimum Yard Projected Labor
    D.      Optimum Yard Projected Overhead
    E.      Optimum Yard Projected Capital Requirements
    F.      Optimum Yard Projected Equipment Requirements
2.      Consolidated 5 Year Projection
    A.      Consolidated Projected Balance Sheet
    B.      Consolidated Projected Income Statement
    C.      Consolidated Projected Cash Flow Statement
3.      Typical Vehicle
4.      Case Study--Griggers Article
5.      Auto Dismantling Association Industry Data
6.      Personal Experience
7.      Resume'
8.      Rand McNally 60 largest Metropolitan Statistical Areas

# Auto Dismantling

## 1. Industry Overview

The auto dismantling industry in the USA is composed of 16,000 wrecking yards doing annual sales volume of $5 billion (US): that's $300,000 per yard. The largest yard does annual volume of $9,000,000; there are no significant multi-yard operators.

This industry is in its infancy and *can* and *will* be rationalized in much the same way that BFI rationalized garbage collection and Ray Kroc of McDonalds changed the fast food industry from a mom-and-pop setup to a business dominated by large fast-food chains.

The industry is on the verge of a technological revolution. The first organization to recognize this and provide the capital and the management expertise will quickly become the dominant force with a market share of 20 to 50%.

A company with the resources can build a business from scratch, without acquisitions, with revenues of $250,000,000 to $500,000,000 within 5 to 7 years. This business can easily generate 20% to 25% pretax on sales, and, since the capital requirements are relatively modest, the rate of return is high.

There is no serious competition in this industry. There will be no expensive and prolonged struggle for market penetration. All that is necessary is to open the doors to a new business and stock the operation with an adequate inventory, and the market share will be instantaneously there.

The industry can be described as consisting of 3 overlapping segments:

> 1. Class A: This segment consists of operations concentrating on very late-model high-dollar cars. Inventory (wrecked vehicles) is purchased almost exclusively from insurance companies through auction pools. Customers are primarily commercial; such as new and used car dealers, body shops, repair shops, other dismantling yards, and rebuilders (rebuilders are those who purchase total wrecks at auctions and rebuild them.)

> 2. Class B: This segment entails the wrecking out of mostly older lower dollar cars. Some inventory is purchased at auctions and some is purchased from private parties and towing lots. The customer base is the same as Class A except for the addition of walk-in customers—do it yourselfers. The vast majority of yards are in this category.

> 3. Class C: In this segment are the self-service yards. Inventory of older vehicles are purchased from private parties and tow lots for very low dollar. Customers pay a $1 entry fee and pull their own parts and pay based on a standard price schedule.

Yards generally range in size from 1 to 25 acres (an acre can accommodate about 100 cars). Some yards predismantle vehicles and inventory the parts, but most do not as this is beyond the

1

management skill level. Rather they use the memory system and the go-look-and-see system and remove the parts from the vehicles as they are sold. This is paralyzingly inefficient.

Sales are made in response to customers phone calls and the use of 2 types of "hot lines":

1. Open voice circuits typically consisting of about 50 member yards in a 500 mile radius. yard may have up to 4 of these voice lines.

2. Computer terminals which receive messages via satellite. One of these is nationwide with about 3,000 members (and also includes Canadian yards), and handles 30,000 parts requests per day, and one covers the western US and has about 500 members. There are other regional systems.

Because virtually all yards lack the capital to carry an adequate inventory, these networks provide a way for a yard to find the part that their customer needs, which they then purchase and resell to their customer at a markup.

## 2. Keys to Success in Auto Dismantling

Based on 5 years of operating a wrecking business, I have identified the key elements which I believe it will take for a company to dominate this industry:

### A. Personnel.

Managers: Fleetwood Enterprises is a large NYSE Company in the Mobile Home and Recreational Vehicle Industry. Fleetwood has made a habit of recruiting its plant managers and plant controllers from Arthur Andersen & Co, one of the largest CPA firms in the world. There are many people who start out in public accounting and decide after a year or 2 that that career is not for them. Arthur Andersen (and the other Big 6 firms) does a very good job in selecting the cream of the crop of the college graduating classes, as is evidenced by their success in dominating the accounting profession. These firms rely on SAT scores and college grades with success. So these type of companies will have provided good screening. It is in their interests to assist those 2 year people who do not wish to continue in public accounting to find employment elsewhere. My strategy would be to recruit from sources like this to build up the most capable management team possible.

Salesmen: Salesmen and managers must be carefully selected based on educational achievements and aptitude tests. The typical salesman in the industry today is a semi-literate high-school dropout. It has been my observation that the industry largely employs those in the bottom quartile of mental ability. These people are typically not comfortable using computers and automotive manuals and therefore do not take advantage of the tremendous resources available.

The salesman position is similar to what it must be like to be an air traffic controller. High pressure, trying to keep up with phone lines, hot lines and computers--very, very intense. An

2

educated, intelligent, organized and motivated person can do a much better job than those typically employed. One of my conclusions, after trying to develop salesmen and analyzing the results, is that there is probably a threshold IQ level of around 115 ( which corresponds to the average college graduate and just 16% of the population) below which a person is not going to be able to get the job done in such a mentally demanding environment.

The Company must generally recruit and train its salesmen and managers rather than selecting from those already employed in the industry.

**Dismantlers:** Dismantling personnel can be recruited from new car dealers. The work is very similar to that of a dealer service department. Working conditions and wages must be competitive. Most wrecking yards today cannot compete in wages and working conditions and thus get inferior employees, in general.

**B. Capital.** <u>Sales in the wrecking industry are entirely driven by the level of inventory</u>. This is a remarkable situation. No outside salesmen are needed and very little or no advertising. The optimum inventory level is at least about $1,000,000. Cost of Goods Sold for a Class A volume operation is 33% and the inventory turns over in about 120 days. Therefore a $1,000,000 inventory will translate into an annual volume of $9,000,000.

As pointed out in the overview, almost no one operates at this level because nobody in the industry has the capital to employ $1,000,000 in inventory. This kind of inventory is looked upon skeptically as collateral by banks because it cannot be practically liquidated. The result (and the opportunity) is that virtually nobody in the business has anywhere near an adequate inventory to operate an efficient business. This is a classic case of economic barriers to entry into the business.

**C. Computers:** Of the 16,000 yards, less than 500 employ computerized inventory systems. Of the 500 who do use computerized inventory probably less than 50 use those systems effectively. I believe I can speak with authority on this subject because I was a member of the computerized fraternity and attended many weekend training seminars with the top guns in the industry and thus I had the opportunity to assess their capabilities.

**D. Inventory Buying:** Inventory must be purchased based on a systematic analysis of sales and costs. This is straightforward with the computer systems available. There is a tendency for the typical beleaguered, undercapitalized wrecker to buy inexpensive slow moving salvage vehicles, mistakenly thinking that the high priced vehicles are too expensive.

Certain vehicles are just red-hot, such as the 1995 Ford Pickup with the new Turbocharged Diesel motor. This is a situation where there is a demand from owners of Ford trucks who wish to upgrade to this Turbo-diesel engine. A complete "changeover" will sell for $7,500-$10,000. One would find maybe 2 or 3 available in the USA on the hot lines at any one time. So it makes sense to buy this type of merchandise. Corvettes, Lexuses, Mercedes are other examples of this type of merchandise that it is virtually unheard of in the industry today for anyone to have in any quantity.

3

The temptation is for a wrecker to buy cars such as Ford Escorts, Ford's least expensive model. A 1995 wrecked Escort can be purchased for as little as say $400. The problem is that the insurance companies "total" these cars in great quantity because they are so cheap to replace as opposed to repair. Therefore wreckers have lots of these cars, and the law of supply and demand dictates that the prices for the parts will be low.

"Specializing" is very popular in the industry: dealing only in Ford products, for example. While this boutique approach has some merit for a small operator, I believe that the correct strategy to be a dominant force in the industry is to specialize in what *sells*. In other words, using the readily available computer information, one can analyze what parts *sell* and *buy* accordingly.

For example, the Toyota Camry has an automatic transmission that fails at a high rate. Consequently, the demand for that transmission is high and they can be sold for $1,500 and one just cannot get enough of them. At the same time some Ford Thunderbirds have the optional V8 engine which is in high demand because it interchanges with Ford pickups with the 302 V8 (Pickup engines are high demand items because pickups tend to get used harder in a work environment. Additionally, the Ford 302 V8 will interchange from 1965 to 1995 [although the interchange books will not show this].). So in my opinion, one wants to buy those vehicles and not Camrys with 5 speed stick shifts or V6 Thunderbirds because of some arbitrary "specialization".

The highest cost vehicles at the auction represent the best value. Most wreckers are not going to be at the auction because they don't have any money. Most of those at the auction have a very small amount of money to spend. If they have $5,000 to spend they will tend to spend it on 10 $500 cars rather than just buying one $5,000 car. But the $5,000 car only costs 1/10 as much as the 10 cars cost to process in terms of dismantling labor, sales labor, freight to ship out the parts when they are sold, hazardous waste disposal, etc. Additionally there is less bidding pressure on the $5,000 car than on the $500 car, so one might get a $6,000 car for $5,000 instead of 10 $400 cars for $500 each.

**E. Inventory Control:** The computer systems that are available specifically designed for the industry are magnificent. Almost no one knows how to use all of the capabilities, or has the discipline to use the capabilities.

It is absolutely imperative that the perpetual inventory be maintained accurately. In order to accomplish this, each vehicle must be inventoried when it arrives and this inventory must be coordinated with the dismantling process. Very few yards do this although it only takes about an hour per vehicle.

The preprogrammed computer systems available are just excellent in this area but it requires discipline, foresight and management to make certain that the integrity of the system is maintained. More often, everybody is too busy and the system breaks down. Once this happens all the sales system's efficiency is lost and people are using the memory system and running all over the lot to check for parts, which is not comparable in efficiency to the computer system.

4

A good example of this is a computer module. Each late model vehicle has several of these modules and they can sell for hundreds of dollars. They usually have about a 10 digit part number. The inventory taker puts these numbers into the computer and when the call comes in the salesman can quickly determine from his computer screen if he has the module being requested.

The more familiar scenario in the industry today is the salesman has to decide if he can spare a person to go around checking vehicles to see if he can match up the numbers (not only are the parts not inventoried in a computer, the parts are still on the car). This is terribly inefficient and that is why the opportunity exists to be the low cost producer by using common sense business principles.

The top 2 computer systems have a copyrighted interchange system incorporated into them. The way an interchange system works, for example, is that when the salesman looks up a request for a 95 Thunderbird left door, the computer system will bring up say a 1993 Mercury Cougar left door because they are the same and thus share the same interchange number.

It is difficult to convey the backwardness that is inherent in this industry today. These principles seem so obvious that the reader would assume that everyone would follow good business practices. But the opportunity exists because this industry is very primitive.

F. A Repeatable System. This is a business that can be reduced to operating procedural manuals and training manuals and turned over to managers with profit and loss responsibility. No prior experience is necessary.

The typical transaction today in the wrecking business consists of the following steps:
1. The customer calls in and the salesman tells him he will check the part and call him back (The salesman must prioritize his requests. In a disorganized operation he may tell the customer he does not have the item because he believes he cannot spare the time to have someone check for the part).
2. The salesman asks the parts puller to go check for the part.
3. The parts puller gets in his yard truck which will not start because he borrowed the battery out of earlier to start the forklift.
4. The parts puller walks out in the yard and looks for the part.
5. The parts puller reports back that he found the part.
6. The salesman calls back the customer and tells him he has the part (Much time has elapsed and the customer may have called other yards with more responsive answers. Let's suppose he orders the part).
7. The salesman writes up the order and hopes it can be filled that day pending checking of parts as more calls come in.
8. The order goes out a day late because personnel were too busy to get it out on time.

The correct way to handle a customer call is:
1. The customer calls and the salesman looks up the part in the computer and tells him yes or no immediately (If the yard does not have the part the salesman can put the

customer on hold and run the part on the voice circuit as a courtesy, then tell the customer "ABC Co has that part, their number is....". Now you have a happy customer.).
2. If the customer orders the part it is usually going to be a predismantled part in the warehouse so the order can go directly to shipping.

This is the kind of systematic, repeatable efficiency that will enable the company to duplicate profitable operations all over the country.

**G. Cost Control.** Sales and cost of sales relationships are controlled through buying the right merchandise based on knowledge of demand.

Labor is controlled by paying sales and production personnel based on their productivity. This will guarantee that labor stays in the 20-25% range. Paying salesmen commissions is a way to make them productive. Many calls in auto wrecking are nuisance calls; for example, the caller wants a $5 headlight ring. We want to discourage the salesmen from wasting time on that unprofitable transaction and encourage them to spend time on higher dollar sales. Commission sales will accomplish this objective. Common sense innovations such as equipping parts pullers with pickup trucks with compressed air to run air tools will assure that the company is the low-cost producer.

Overhead is controlled through high volume of high dollar cars, which reduces unit overhead; and sound business practices.

### 3. Business Strategy

Per Rand McNally the 60 largest Metropolitan Statistical Areas (MSA) (see Appendix 8) encompass about 130,000,000 people, or about 50% of the US population. I believe that about 60 yards could serve those 60 areas and could be put in service on a 1 per month schedule over 60 months. This could be started after appropriate due diligence was performed, probably including a pilot facility where these principles could be verified.

Sacramento is 34th on the MSA list at 1,488,900 population and based on my personal experience in this market I believe that a yard could easily do $5,000,000 in this area. If we then extrapolate to the 130,000,000 population in the 60 largest MSA we could expect to be doing volume of about $500,000,000. I believe this is realistic and conservative.

At this point in the evolution of the industry the market penetration will be instantaneous--there is no serious competition and the sales will be determined by the inventory level.

The task then becomes one of management:
    Recruiting
    Instilling pride and esprit de corps
    Training
    Striving to become the most efficient low cost producer
    Establishing brand identity and consequent price leadership

6

## 4. Facilities and Pollution Control

The optimum facility I believe will be about 30 acres: 10 acres each for Classes A B and C. The primary emphasis is on the Class A operation but the other 2 classes overlap and complement the primary one.

The Class A yard will require a building of about 10,000 square feet for office, warehouse, and dismantling. The warehouse is used for storage of dismantled parts including engines, transmissions, computer modules and interior components. The dismantling area will resemble the service area of a modern new car dealer. Each dismantler will have a service bay station with a hoist, compressed air supply, and a locker to secure his tools.

Pollution and hazardous waste spills are a way of life in the business now primarily because of lack of facilities planning and systems. The correct approach is to isolate all fluid draining to a specific roofed area with a concrete floor protected by curbs and catch drains. All vehicles would be processed through this area as part of the dismantling process so that by the time a vehicle was taken into the yard for inventory storage there will be no fluids remaining to leak. All these fluids including gasoline, diesel fuel, freon, anti-freeze, power-steering fluid, oil and brake fluid would then be properly and legally disposed of or recycled. Batteries, tires and scrap steel are other materials which must be handled and disposed of. This is an area where hazardous materials expertise will be invaluable. The opportunity exists to create new hazardous material handling and disposal applications. With history is a guide, one can predict that the development of more and more sophisticated pollution controls will make that aspect of the business ever more expensive and lead to a shaking-out of weaker competitors, leaving the industry to be shared by a few large, well-capitalized corporations.

## 5. The Assembly Line

To the uninitiated the auto wrecking industry may seem like a job-shop type of business. Actually, it can be operated as very much of an assembly line process. The inventory is selected by the buyer at the auction and just happens to come in a rather unusual package. The dismantler then takes those good parts off the vehicle, as directed, and puts them into the warehouse. The hulk and the broken parts are discarded The computer inventory then allows the parts to be sold in much the same way that any new parts are sold.

## 6. Pricing

Dealer retail list price is frequently used as a reference point for pricing. Commercial accounts can buy new parts from dealers for about 80% of list, so wrecking yard prices can be 50-75% of list for late model car parts. Supply and demand is the major pricing factor. An inventory buyer can, for example, request price quotes over the circuits on parts he is contemplating bidding on at the auction, to determine his correct bid price for the vehicles.

7

## 7. A Case Study

It is instructive to analyze an article from <u>Automotive Recycling</u> November/December 1994 (see Appendix 4). The article is a member profile of Bob Griggers of Bob's Auto Salvage of Macon, Georgia. Mr. Griggers is the new President of the national association: Automotive Recyclers Association.

The article implies that Mr. Grigger does not have a college education: this is typical of the yard owners I have encountered. He describes his vision of a progressive facility and mentions that he visits other wrecking yards on his vacations.

He describes his operation as 29 acres total, 75% retail, 750 cars per year purchased mostly from auction pools, 8 employees and emphasizing General Motors and American. 10 acres are dedicated to the Pick'n Pull (what I have referred to as Class C) and the balance being cars 4 years and older (what I have referred to as Class B).

He says that he is concerned with the high cost of salvage, calling it a "crisis". He complains about rebuilders unfairly buying all the good cars. He says he believes that "warranties limit sales on late model cars". He is de-emphasizing his Class B operation in favor of increasing the size of his Class C operation because the overhead is lower.

While the decision Mr. Griggers makes is probably right for him because it reflects the management limitations of his organization, it is not a good business strategy if one can employ top-notch management skills.

The cars 4 years old and newer, the cars he doesn't deal in, are the most profitable segment of the business! Of course, one must have the capital to stock those cars. These are the cars that the insurance companies are fixing. These cars are mostly financed so the lender requires the owner to carry comprehensive insurance. Prices resemble those in the health care industry: a little tap in the taillight can cost well over $1,000 when an insurance company is paying the bill. There is an insatiable demand for the parts on these cars that are involved in collision repair. While it is true in some cases that a newly introduced engine, for example, will be a slow seller because of warranties, the solution is to value that engine at $0 when bidding.

It is a common lament of yard owners to complain about the rebuilders (spelled foreigners) buying all the good cars and paying too much because they don't have any overhead. These rebuilders are a very large customer segment and they buy lots of expensive parts from wreckers to finish their rebuilding projects. A typical example is a rebuilder who buys a Lexus LS400 with a burned up interior from an underdash fire at the auction. A sharp wrecking yard attends auctions every day and has more chances to buy a Lexus. Rebuilders can only attend auctions sporadically because they are typically one-man operations. Rebuilders will buy most Lexuses but there are always a few that are damaged too extensively, or the wrecker is just there when the rebuilders are out of money at the end of the auction, or something. So that rebuilder now needs a complete interior to fix that Lexus. He is going to buy that from a wrecking yard for $7,500 to $10,000. Then he is going to find that there is a wiring loom and a little computer module that he

8

needs that has a list price of $3,500 from Toyota. A sharp wrecker is going to have that Lexus merchandise in stock or he is going to find it 2,000 miles away via satellite.

In order to cater to that late model market one must be adept at using the hot lines, satellite lines, and be familiar with interstate shipping and rates. This is pretty simple and basic stuff. I shipped and bought from all over the USA, but many wrecking yard owners are very provincial and are not comfortable dealing outside of the local market.

He specializes in General Motors and American cars. This makes no sense for a large operator. Toyota 4-wheel drive pickups are enormously popular and profitable; so are Corvettes. It makes sense to buy those vehicles that sell, regardless of what manufacturer makes them. Furthermore, a repair shop usually does not specialize. Therefore he is probably going to be the customer of a non-specialized yard.

He is cutting back on traditional wrecking and going to self-serve: this is abandoning the largest segment of the business. He believes it makes sense because the overhead is lower. The overhead is lower on self serve but now his customers are only those people with old junkers who work on them themselves and are very price sensitive.

It is true that a Class B operation is a high overhead proposition because the cars are too old and common for high prices. It's that Escort syndrome: all wreckers buy $300 Escorts at the auction because they are cheap. There are lots of them totaled because they are cheaper to replace than to fix. So the wrecker can't get more than $150 for a door because every other yard in town has the same door. It costs the same amount to process that Escort in labor and overhead as an $8,000 Lexus with doors that sell for $2,000; that's how to control overhead.

### 8. Auction Buying

This function is so important that it requires the direct participation of the general manager. One must have a good current understanding of the market and a thorough knowledge of all vehicles and optional equipment.

One computes a bid for a vehicle by considering:
1. Current inventory level--do we need any of these parts?
2. Strength of current market demand for the good parts remaining on the vehicle.
3. Selling prices of the good remaining parts.

The buyer then multiplies the estimated selling price of the parts by the desired cost of sales percentage to arrive at a bid price (see Appendix 3).

A typical auction house holds a sale every week and it lasts all day, about 700 vehicles being auctioned off for about $700,000. In the Sacramento area about 1000 cars per week are auctioned off for about $1,000,000, so the proposal to buy 88 vehicles a month is modest (88 vehicles x $1,500 minimum=$132,000 cost of sales, which equates to $400,000 sales @33%).

9

A buyer can pre-bid the auction the day before in 2 or 3 hours and then delegate the actual bidding to a subordinate if desired. On the other hand, the auction is a good place to exchange information with others in the industry.

## 9. Research and Development

Many opportunities arise in which knowledge is gained in the operation which can give one a competitive edge.

Toyota Tercel Station Wagon Four-wheel drive 6-speed transmissions have a high failure rate and are therefore big sellers. The rest of the vehicle is not too exciting, the motors seem to last forever and therefore don't sell well. I found that rebuilding these transmissions was very lucrative and, furthermore, we learned to convert Tercel 2 wheel drive transmissions into 4 wheel drives.

Toyota 4-wheel drive pickup transmissions had a particular part that was weak and was the source of most failures. The part cost $200 from Toyota to repair them, we found a machine shop that repaired the part at a cost of $35.

The Toyota Pickup and Forerunner 4 cylinder engine (22R/22RE) that is in use today (1995) was introduced in 1981. The 1981 motor will interchange with the 1995, although the interchange books will not show this. We learned that we could recondition core motors at a material cost of $300 and a labor cost of 10 hours.

These examples seem simple and a matter of common sense, but, they are not common knowledge in the industry. I would buy 2 wheel drive Tercel transmissions over the hot lines for $150 outright (no core) to convert into $900 4 wheel drive transmissions because other people had no idea about these things.

There is enormous leverage in this kind of transaction. It is very difficult to buy a Tercel 4WD at auction because the only part we want is the transmission. We don't want to pay for a bunch of doors and engines that will not sell. But the R&D program enables the enterprise to have those high dollar, high profit, fast selling parts in constant stock. Then one's reputation is enhanced when it becomes industry knowledge that our Company always has the hard to find parts in stock. R&D leads from one opportunity to another. The interchange systems in the industry are fairly primitive. There are many opportunities to get a competitive edge by doing routine R&D. Virtually no one in the industry today does this in any comprehensive, systematic way.

Certain parts seem to lead one to the conclusion that rebuilding and reconditioning are lucrative. These parts have a high failure rate and are in constant high demand. The hot lines are constantly buzzing with requests for these parts. Since all parts in the industry are sold on an exchange basis, one gets the customer's old part for free. Frequently, one finds there is very little damage to the old part and it can be reconditioned economically.

10

It seems to me that reconditioning and rebuilding of parts is a natural progression that will lead to a spin-off company or separate profit center. But the strategic rebuilding of selected high demand parts is necessary to establish and maintain preeminence in the industry.

In the real estate industry photography technology is now such that photographs can be taken and the film cassette loaded into a computer. This will be a real benefit for an auto dismantling salesman to be able to pull up photos on the screen to see if he has a certain body cut, for example.

### 10. Capital Requirements and Payback Period

The Optimum Yard will earn $1,500,000 after taxes per year. (Appendix 1.-A)

The Optimum Yard will employ $4,000,000 in assets (Appendix 1.-E)

Therefore, the after-tax Rate of return is 37.5 %.

Therefore, the payback period is about 3 years.

The payback period is about one year if Property, Plant & Equipment are financed.

The consolidated 5 year financial projections (Appendix 2) illustrate that if 60 yards were put on line at a rate of 1 per month the maximum capital required would be about $40,000,000. If Property, Plant & Equipment were to be financed, however, this amount could be reduced to almost zero.

For ease of illustration, internal growth has not been considered. This type of static analysis is for illustrative purposes only. It merely demonstrates that a rapidly growing company requires a net capital outlay for a couple of years until the earnings become significant (year 3 in Appendix 2).

### 11. Projected Startup Costs

A pre-operating period of about 6 months to 1 year is dictated by the lead time necessary to obtain a location and build the facility (whether leased or purchased). Until the building is completed and the facility is within 60 days of opening all that is required is the project manager and a secretary. Then there will be a 60 day training period for the newly hired employees.

This time can be used to prepare the operating manual and setting up the training program and writing the training manual.

While the possibility exists of shortening the lead time to start the test facility by acquiring an existing facility there are 2 main concerns that must be addressed. The first is the possible liability for soils contamination. Will a level 2 EPA toxic soils test clearance forever protect a buyer from previous contamination liability? The second problem with acquiring an existing facility is the difficulty in finding one with an efficient layout.

11

| Month | Description | Amount |
|-------|-------------|--------|
| 1 | Project Manager, Secretary, Office | $25,000 |
| 2 | Project Manager, Secretary, Office | $25,000 |
| 3 | Project Manager, Secretary, Office | $25,000 |
| 4 | Project Manager, Secretary, Office | $25,000 |
| 5 | Project Manager, Secretary, Office | $25,000 |
| 6 | Project Manager, Secretary, Office | $25,000 |
| 7 | Project Manager, Secretary, Office | $25,000 |
| 8 | Project Manager, Secretary, Office | $25,000 |
| 9 | Project Manager, Secretary, Office | $25,000 |
| 10 | Project Manager, Secretary, Office | $25,000 |
| 11 | Project Manager, Secretary, Office, New Employees Orientation & Training | $75,000 |
| 12 | Project Manager, Secretary, Office, New Employees Orientation & Training | $75,000 |
| | Total | $400,000 |

## 12. Summary

**Why Auto Wrecking?** This is a 5 billion dollar per year undiscovered industry in its infancy. There are no big companies in the industry now to provide serious competition. The business lends itself to rationalization and a dominant market penetration position can be attained in a short time. Margins and the rate of return are high.

**How much will it cost to test the market?** A pilot facility has a 1 year lead time to construct and will require $4,000,000. This amount can be reduced to about $1,220,000 if assets are financed (see Appendix 1-E).

**What is required for a pre-operating budget?** About $400,000 (see Item 11).

**What is the goal?** To attain market share leadership in the industry by building about 60 facilities in the USA over a 5 year period with gross revenues of about $500,000,000 (see Item 3 and Appendix 8).

**What can we do that isn't already being done?** Bring in modern, sophisticated management methods that are routine in other industries but that haven't yet been applied to Auto Dismantling.

12

## Auto Dismantling
## Optimum Yard Projected Income Statement

| | | Month $ | % | Year $ | % |
|---|---|---|---|---|---|
| Sales | ( See Projected Sales & Cost of Sales) | 750,000 | 100 | 9,000,000 | 100 |
| Cost of Sales | (See Projected Sales & Cost of Sales) | 250,000 | 33 | 3,000,000 | 33 |
| Gross Profit | | 500,000 | 67 | 6,000,000 | 67 |
| Labor | (See Optimum Yard Projected Labor) | 158,000 | 21 | 1,896,000 | 21 |
| Overhead | (See Optimum Yard Projected Overhead) | 137,500 | 18 | 1,650,000 | 18 |
| Pre-tax Profit | | 204,500 | 27 | 2,454,000 | 27 |
| Income Taxes--40% | | 81,800 | 11 | 981,600 | 11 |
| Net Income | | 122,700 | 16 | 1,472,400 | 16 |

Appendix 1-A

Auto Dismantling
Optimum Yard
Projected Sales and Cost of Sales

Sales volume will be determined by the level of inventory. An inventory level of $1,000,000 will turn over every 120 days and the gross profit margin will be 67%.

Inventory level of $1,000,000 equals sales of $3,000,000 every 120 days, or, $750,000 per month.

The cost of sales, then, will be $250,000 per month (33% of sales of $750,000). This means that as many as 167 vehicles @ $1,500-$2,500 each, on average, will be purchased and dismantled each month to replace inventory.

Appendix 1-B

Auto Dismantling
Optimum Yard
Projected Labor

| Job Description | Logic | # Employees | $ |
|---|---|---|---|
| Salesmen | Base salary of $3,000 per month plus incentives | 10 | 42,000 |
| Dismantlers | Paid $100 per vehicle dismantled | 8 | 17,000 |
| Parts Pullers | Paid $8 per hour | 10 | 16,000 |
| Inventory/Lift | Base salary of $3,000 per month plus incentives | 1 | 3,000 |
| Office | Paid $9 per hour | 4 | 7,000 |
| Warehouse | Paid $9 per hour | 3 | 5,000 |
| Delivery/local | Paid $7 per hour | 4 | 6,000 |
| Gen. Manager | Base salary of $5,000 per month plus incentives | 1 | 8,000 |
| Fringes | 15% payroll taxes, 25% workmen's compensation, plus 10% health insurance | | 53,000 |
| Total | | 41 | 158,000 |

Appendix I-C

Auto Dismantling
Optimum Yard
Projected Overhead

| Description | Logic | $ |
|---|---|---|
| Rent | Corporate capital charge, 10% of $4,000,000 per year | 33,000 |
| Hot Lines | 10 @ $400 | 4,000 |
| Telephone | Est. | 10,000 |
| Utilities | Est. | 3,000 |
| Insurance | Est. | 10,000 |
| Advertising | Mailers | 2,000 |
| Legal | Est. | 2,000 |
| Accounting | Est. | 2,000 |
| Gasoline | Delivery trucks | 1,500 |
| Freight out | 30 shipments per day @ $50 | 30,000 |
| Employee expenses | Est. | 5,000 |
| Supplies | Est. | 10,000 |
| Misc. | Est. | 25,000 |
| Total | | 137,500 |

Appendix 1-D

Auto Dismantling
Optimum Yard
Projected Capital Requirements

| Asset Description | Amount | Cash required if maximum leverage employed |
|---|---|---|
| Accounts Receivable--30 days sales | 750,000 | 150,000 |
| Inventory | 1,000,000 | 1,000,000 |
| Equipment | 350,000 | 70,000 |
| Space: | | |
| Land | 1,400,000 | Lease |
| Building | 500,000 | Lease |
| Total | 4,000,000 | 1,220,000 |

Financing is a corporate decision that is beyond the purview of this presentation. In order to make a complete projection, however, it is necessary to make some assumptions about the cost of capital. It has been assumed that the parent corporation will provide all assets and charge the Auto Dismantling operation 10% on capital employed. In this case then, capital required is $4,000,000 per yard and the 10% annual charge is reflected as an expense in the Pro Forma Income Statement. For simplicity, depreciation has not been considered.

Appendix 1-E

Auto Dismantling
Optimum Yard
Projected Equipment List

<u>Description</u>

<u>Cost</u>

| Description | Cost |
|---|---|
| Forklift, 8,000 lb. | $20,000 |
| Forklift, 8,000 lb. | 20,000 |
| Forklift, electric, for warehouse | 5,000 |
| Racks, warehouse | 25,000 |
| Hoists, dismantlers, 10 @ $2,500 | 25,000 |
| Steam cleaners, hazardous waste controls, tanks, etc. | 125,000 |
| Air compressors | 10,000 |
| Computers | 50,000 |
| Furniture | 20,000 |
| Telephones | 10,000 |
| Welders, torches, small tools | <u>40,000</u> |
| **Total** | **$350,000** |

Appendix 1-F

Auto Dismantling
Projected
Typical Wreck--1995 Toyota SR5 V6 4WD Pickup
Hit in front, bent frame

| Description | Sales Price |
|---|---|
| Engine | 1,500 |
| Engine Core | 250 |
| Transmission | 700 |
| Transmission Core | 150 |
| Rear Differential | 250 |
| Driveshafts-2 | 250 |
| Complete SR5 interior with Lumbar bucket seats | 1,500 |
| Doors-2 | 600 |
| Pickup Bed | 800 |
| Mag wheels-4 | 400 |
| Tires-4 | 100 |
| Air Conditioning Compressor | 100 |
| Alternator | 100 |
| Smog Pump | 50 |
| EGR Valve | 50 |
| Computer Module | 150 |
| Jack and Tools | 75 |
| Power Steering Gear | 200 |
| Power Steering Pump | 50 |
| Power Brake Booster---will not sell | 0 |
| Engine Wiring Loom | 200 |
| Rear Axles--slow sellers | 0 |
| Rear Axle Housing--slow sellers | 0 |
| Rear Drums--slow sellers | 0 |
| Front Rotors-2 | 40 |
| Calipers-2-Core value-slow sellers | 30 |
| Front Axles | 200 |
| Front Differential--slow sellers | 0 |
| Control Arms | 100 |
| Catalytic converter--Core | 25 |
| Exhaust Manifolds-2 | 90 |
| Header Pipe | 100 |
| Cab Assembly | 600 |
| Intake and Air Flow Meter | 600 |
| Radio/CD Player | 250 |
| Instrument Cluster | 100 |
| Transfer Case | 250 |
| Rear Sliding Window | 50 |
| Total | 9,910 |

Therefore this vehicle can be purchased for up to $3,300 (1/3 of 9,910).

Appendix-3

## Auto Dismantling
## Personal Experience

I became aware of auto wrecking through interest in the real estate. I had no experience and no particular interest in automobiles and mechanics. I found myself in the auto wrecking facility talking to the owner on many occasions. My auditor's eye noticed many interesting things about the business. The profit margin seemed high. The operation seemed so disorganized that most of the labor was expended in looking for lost tools.

It seemed like an opportunity for modern management techniques. If one were to try to go into a glamorous industry like the airlines, there are so many sharp people with impressive college degrees and professional accomplishments working there that they have already thought of all of the innovations. Auto wrecking was, and is, a veritable mother lode of opportunity. There are almost no sophisticated business people in the industry. I believe this is because no one heretofore has figured out how to run this business as an assembly line process. The common misperception is that there is all art and no science to it.

After buying the business, I found that the available employees were not up to the task of upgrading and modernizing the operating techniques. I bought a state of the art computer system designed especially for auto wrecking and discovered that the employees could not master its many features. After much trial and error, I reached the considered conclusion that it was simply a matter of recruiting a different type of employee: college graduates.

Eventually, and to my eternal surprise, I found myself totally immersed in the operation in a hands-on fashion. I found that I, who knew nothing about automobiles, could sell parts very effectively because it was by the numbers: interchange numbers.

Soon I was sitting at a sales desk with 3 computer screens in front of me, 4 hot line speakers (one at each corner), and a telephone headset on to keep my hands free. I sold between $30,000 and $50,000 personally per month out of a 1 1/2 acre yard with an inventory of about $50,000.

I also met all the yard owners in Sacramento and the San Francisco area at auctions and seminars. Attending an auction is an all-day affair. Yard owners tend to attend to the buying function personally so one has the opportunity to chat with them all day long. This gave me the experience of understanding how little these successful operators take advantage of modern management methods. I would learn from their comments how little homework they had done on vehicles they were buying. For example, the axle ratio of Ford pickups is coded on a plate on the door-jam. I had a copy of the decoding book which I took to the auctions (and looked at only surreptitiously). Certain ratios are worth $500 while others are worth almost nothing. I would watch large owners buy such a truck and comment that they hoped it had such-and-such ratio, thus demonstrating that they didn't do the most basic homework that I took for granted. They literally take the rear-end apart and count the ring and pinion before they know what ratio they have.

Five years of this led me to the conclusion that this was a golden opportunity to create a big business quite simply. Once a large company comes into the market imitators will surely follow. A head start is a big advantage, however, much as Federal Express has demonstrated to the much larger United Parcel Service.

Appendix-6

**James Carr**

4120 Cameron Park Dr. #201
Cameron Park, The State of California. 95682

916-677-2600 (office)   916-677-5496 (res.)

## Professional Experience

1985 to present

**Tom Check Real Estate** *Cameron Park, Ca.*
*Real Estate Brokerage and Development*

1974 to 1985

**Staff Investment Co.** *Los Angeles, Ca.*

*Industrial real estate development, syndication,investment,property management and brokerage. Net worth in eight figures*

<u>Chief Financial Officer</u> Responsible for all financial functions for several partnerships and corporations, including:

| | |
|---|---|
| Income taxes | Banking and loan negotiations |
| Investment analysis | Construction and joint-venture accounting |
| Project analysis | Computerized operations |
| Purchase investigations | Industrial Development Bond financing |

1971 to 1974

**ELIXIR INDUSTRIES** *Gardena California*
*A $100,000,000 NYSE metal fabrication and manufacturing firm with over forty plants throughout the United States serving the recreational vehicle and mobile home industries.*

<u>Corporate Controller</u> - Responsible for preparation of filings with the S.E.C.,monthly financial statements, and accounting policies; design and implementation of accounting systems; direct supervision and administration of all accounting, budget, and related departments; work directly with outside auditors. Heavy emphasis on original design of policies and procedures.

1969 to 1971

**ARTHUR ANDERSEN & COMPANY, CPAs** *Los Angeles, California*
<u>Senior Accountant</u> - Specialized in audit engagements with exposure to the following industries: service, retail, wholesale and manufacturing. Responsible for planning, performing and reviewing audit engagements, resulting in preparation of financial statements, tax return, internal control reports and filings with the SEC

**Education** California State Polytechnic College San Luis Obispo, California. B. S. Business Administration, 1969

**EXHIBIT   B**

Jim Carr
3200C United Drive
Cameron Park CA. 95682
office (916) 677-2600   res. (916) 677-5496   fax (916) 677-4876

November 28, 1995

Mr. Wayne Huizenga
Huizenga Holdings
200 So. Andrews Ave.
Fort Lauderdale, FL 33301

Dear Mr. Huizenga,

I have followed your career by reading business publications regarding WMX and Blockbuster. I have an idea that might appeal to youindustry.
I am a CPA, an Arthur Andersen alumnus, former NYSE Chief Financial Officer and a seasoned, polished executive.

I invested money in an auto dismantling business for what I thought was a real estate opportunity. I soon found myself immersed in auto dismantling and operated the business hands-on for about 5 years. The stereotype of the greasy pollution-pit is erroneous: I'm talking about modern, environmentally fail-safe facilities where a typical wreck is a 1996 Lexus LS400 purchased for $8,000 and generating sales of $25,000 over 120 days.

I believe that this wrecking industry is in its infancy and *can* and *will* be rationalized in much the same way that BFI rationalized garbage collection and Ray Kroc of McDonalds changed the fast food industry from a mom-and-pop setup to a business dominated by large fast-food chains. You did basically the same thing with Blockbuster--that's why I think you can understand my vision.

I believe that I can build a company from scratch, without acquisitions, with revenues of $500,000,000 to $1,000,000,000 within 5 to 7 years. This business can easily generate 20% to 25% pretax on sales, and, since the capital requirements are relatively modest, the rate of return is high. This would be about a 20% share of the US market.

There are no sophisticated businessmen in this industry now-everything is mom-and-pop. Ironically, the business lends itself perfectly to sophisticated computerized business systems. I have the formula down pat covering all aspects of this business from pollution control to personnel-I can put this in a procedures manual and pop these facilities up all over the country. *I believe that I understand this business better than anyone else in the industry.*

Additionally, I believe that an entirely new industry can be created as an offshoot of this enterprise. Currently, dismantlers discard an enormous amount of parts because there is no way to market them effectively. One example is glove-box doors, which may list for $200 from a new car dealer. With an organization of the size I plan, one could organize a centralized computer and

phone center for processing overnight delivery of such parts in competition with new car dealers and auto parts stores. The sales potential and profit margins would be in the stratosphere. This would be to the auto parts industry what Federal Express is to the airline industry

If you're interested I would like to discuss this with you further at your convenience. I have prepared a business plan which runs some 35 pages which I can send you.

Sincerely,


Jim Carr

**EXHIBIT C**

Jim Carr
3200C United Drive
Cameron Park CA. 95682
office (916) 677-2600   res. (916) 677-5496   fax (916) 677-4876

January 8, 1996

Mr. Jeff Davis
Auto Nation USA
One Financial Plaza Suite 1700
Fort Lauderdale, FL 33394

Dear Mr. Davis,

Thank you for expressing interest in my Auto Dismantling proposal.. Enclosed is the business plan, as we discussed. I hope you find it interesting and compelling. If you our any of your staff would like further information or clarification, please call me anytime.

I would like to expand on my answer to your question about why 25% pre-tax profit margins can be expected. The operation I propose is to emphasize Class A (Class A is defined in the business plan), as opposed to Class B which is the norm in the industry today. A Class A business will be dismantling salvage vehicles purchased for an average cost per unit of about $2,000, compared to a typical Class B cost of about $500 per unit. Therefore the labor and overhead costs which are directly attributable to the number of units processed (for example, dismantling labor and salesman cost per order) will be much lower as a percentage of sales. Another reason is that the supply and demand ratio is such that Class A parts are scarcer than Class B, therefore they are in higher demand, and therefore the sales prices one can demand are correspondingly higher.

Note that the business plan does not address the possible creation of an "overlay" business segment on top of the traditional auto dismantling. Briefly, I believe it will be an inevitable outgrowth of the first large business to come into this industry and take a dominant market share. The interchange numbering system in use today is very primitive, it covers only about 200 or so parts of a vehicle; contrasted with the thousands of parts that the automobile dealerships parts departments can access from their computerized parts systems. Consequently, today, auto dismantlers routinely discard many valuable parts because they have no effective way to market them. I believe that once the organization reaches critical mass, say $500,000,000 volume from 60 facilities in the 60 largest metropolitan areas, it would be a natural progression to establish the "overlay" business to market these extra parts in competition with new-car dealers parts departments and auto parts stores. I envision this would perhaps be a single facility with computer systems integrating the company's inventory from all 60 yards, the current interchange system and the computerized parts numbering systems provided to the car dealers by the manufacturers. The company could provide overnight air service on parts at around, say, 40% of dealer list price. This service could be marketed to retail and well as wholesale customers, could be a second transformation of the industry, and conceivably could dwarf the original company.

Sincerely,

Jim Carr

EXHIBIT    D

## Jeff Davis Tour Itinerary    Feb. 20, 1996

| Contact | Company | Estimated Sales | Comments |
|---|---|---|---|
| Byron Horn | B & D Auto Parts-- Concord, California | $200,000 per month--- may be much less now due to divorce | Top computerized yard--very progressive in use of computers--tries to deal in Class A merchandise--extensive use of top industry consultant |
| Larry | American River Auto Wrecking--Rancho Cordova | $200,000 to $400,000 per month | One of the top 2 or 3 yards in California. Best facility layout I have seen--90 % Class B--heavy retail walk-in customer base |
| ? | Pick N' Pull--Rancho Cordova | ? | Class C--self serve yard--next door to American River Auto Wrecking |
| Clint Zufelt | All Foreign Auto Dismantlers--Rancho Cordova | $100,000 per month, may be less now due to loss of key salesman and sale of acreage | Heavy Brokerage business--has lots of new car dealer customers but little inventory |
| Darryl Miller | James Auto Wrecking-- Sacramento | $150,000 per month | Typical high volume Class B and some Class A--Also owns a Class C self-serve yard next door--Weak in computers-- primarily a look and see and remember inventory system driven by owners who are strong parts men |

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF EL DORADO
3321 Cameron Park Drive
Cameron Park, California 95682
(530) 621-5867                    Fax (530) 673-**EL DORADO CO. SUPERIOR CT.**

**EL DORADO CO. SUPERIOR CT.**

CASE NO. PC 20170375

**FILED   JUN 15 2017**

Plaintiff,

JAMES CARR

vs.

Defendant.

AUTONATION, INC., A DELAWARE CORPORATION

BY **J. Jimenez**
Deputy

**NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE**
(Local Rule 7.12.05 and .09)

NOTICE IS HEREBY GIVEN that a CASE MANAGEMENT CONFERENCE in the above entitled case is set for  1:30 on 10/16/17, in Dept. 10. 3321 Cameron Park Drive, Cameron Park, California.

A Case Management Statement must be filed and served not less than 15 days before the Conference.

If a party is demanding a jury trial, pursuant to Civil Code of Procedure section 631(b), a non-refundable jury fee of $150.00 must be deposited with the court on or before the initial Case Management Conference date in this action. Failure to timely deposit the funds will result in a waiver of a jury trial.

At the CASE MANAGEMENT CONFERENCE you will be assigned a Dispute Resolution Conference Date, a Mandatory Settlement Conference Date, and a Trial Date. In lieu of a Dispute Resolution Conference, the parties may elect mediation, binding arbitration, or judicial arbitration.

In addition, the court will make pre-trial orders.

The Court will require full compliance of El Dorado County Local Rules, in particular, the rules governing Trial Court Case Management (rule 7.12.00, et seq.). For additional information regarding the Trial Court Case Management Program visit our website at: www.eldoradocourt.org

You must be prepared to discuss all matters and dates which are the subjects of the Case Management Conference. Telephonic court appearances are provided through the Court. To sign up to appear by telephone please go to the court's website at http://www.eldoradocourt.org/onlineservices/vcourt.html at least five (5) days prior to the scheduled conference.

CMC1                                                           Rev 05/20/13

CLERK'S CERTIFICATE OF SERVICE
I declare under penalty of perjury that I am over the age of 18 and not a party to the above action; that a copy of NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE was placed for mailing through either the United States Post Office or Inter-Departmental mail on the parties at the address shown herein.
Executed on 06/15/17, in Cameron Park, California.

Delivered to:

KEVIN A. JAMES
263 MAIN ST,
LEVEL 2
PLACERVILLE CA 95667-5541

Tania Ugrin-Capobianco, Court Executive Officer

J. Jimenez

By: _____

Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF EL DORADO

### NOTICE TO LITIGANTS

### CIVIL TRIAL DELAY REDUCTION AND ALTERNATIVE DISPUTE RESOLUTION REQUIRED PROCEDURES AND TIME LINES

All general civil cases are included in the El Dorado Court's Civil Trial Delay Reduction Program. Local Rules for the El Dorado Superior Court require that you comply with certain procedures and meet certain time lines for these cases. Please see Local Rule 7.12.00 et seq.

Plaintiffs and Cross-Complainant must serve the following documents with the Complaint or Cross-Complaint on all other parties: 1) A copy of this Notice to Litigants; 2) A copy of the Notice of Case Management Conference; and 3) A blank Case Management Statement. This service must be accomplished and proof of service must be filed within 60 days of the filing of the Complaint or Cross-complaint.

A Case Management Conference (CMC) will be held within 120 days of filing of the Complaint. The date and time are indicated on the Notice of Case Management Conference. You must file a completed Case Management Statement at least 15 days prior to the Conference.

At the CMC, the court will assign a Dispute Resolution Conference date, a Mandatory Settlement and Readiness Conference date and a trial date. The court may also assign an Issues Conference date. In lieu of a Dispute Resolution Conference, all parties may elect mediation, private arbitration or judicial arbitration. You may obtain a stipulation and order to participate in alternative dispute resolution and a list of the attorneys on the Dispute Resolution Conference, arbitration or mediation panels from the court's website or the clerk's office.

Dispute Resolution Conferences will be conducted by one attorney temporary judge. You may obtain a list of the attorneys on the panel on the Court's website at www.eldoradocourt.org.

Dispute Resolution Conferences are conducted as early Mandatory Settlement Conferences pursuant to CRC Rule 3.1380 which requires that trial counsel, parties and persons with full authority to settle personally attend, unless excused by the court, and that no later than 5 court days before the conference, each party file and serve on each other party a Settlement Conference Statement with a good faith settlement proposal. The Dispute Resolution conference is conducted by a volunteer settlement attorney.

It is important to review Local Rule 7.12.00 et seq. and El Dorado Superior Court's ADR program with your client. It will increase the possibility of your client's case being resolved at an early, less expensive stage.

### DISPUTE RESOLUTION CONFERENCES REQUIRED PROCEDURES AND TIME LINES

The Court has initiated an Alternative Dispute Resolution (ADR) Program which applies to all civil cases which are subject to these rules; provided, however, that on the joint request of the parties or on its own motion, the Court may order that the program apply to any civil case.

Unless the parties agree to another form of ADR, they will be ordered to participate in a Dispute Resolution Conference (DRC). The DRC will be conducted by a volunteer attorney temporary judge. The DRC will be conducted as a Mandatory Settlement Conference pursuant to California Rules of Court, rule 3.1380, and the parties and counsel are directed to comply with the terms thereof.

Trial Reduction Notice to Litigants

Within 7 to 10 days after the Case Management Conference, the court will notify the parties of the DRC temporary judge assigned to the case. It is the responsibility of the plaintiff to contact the temporary judge and arrange for a time and place for the DRC convenient to them and all parties.

At least 10 court days prior to the DRC, each party is to submit to the temporary judge and the other parties a Dispute Resolution Conference Statement which meets the requirements of California Rules of Court, rule 3.1380, and any special requirements set forth below.

Prior to the DRC, the parties are to exchange documents and records pertinent to settlement and shall provide copies of these to the DRC temporary judge.

With leave of court and in lieu of participation in a DRC, the parties may stipulate to private arbitration (binding or non-binding), judicial arbitration, or mediation. The parties may select the neutral from the Court's panel or a private neutral of their choice. The parties will be responsible for any fees associated with arbitration, judicial arbitration or mediation. The Court's panel of neutrals may be obtained from the court's website.

## MANDATORY SETTLEMENT AND READINESS CONFERENCE
## REQUIRED PROCEDURES AND TIME LINES

A **MANDATORY SETTLEMENT AND READINESS CONFERENCE** (MSRC) will be held approximately three to four weeks prior to trial. See CRC Rule 3.1380 and Local Rule 7.12.10.

The MSRC will be conducted as a **MANDATORY SETTLEMENT CONFERENCE** pursuant to CRC Rule 3.1380, which provides:

1. That trial counsel, parties and persons with full authority to settle the case shall personally attend the conference, unless excused by the court for good cause shown; and

2. That no later than five court days before the conference, each party shall submit to the court and serve on each party, a Mandatory Settlement Conference Statement containing a good faith settlement demand and an itemization of economic and non-economic damages by each plaintiff and a good faith offer of settlement by each defendant. The Mandatory Settlement Conference Statement shall set forth and discuss in detail all facts and law pertinent to the issues of liability and damages involved in the case as to that party.

The MSRC will also be conducted as a **TRIAL READINESS CONFERENCE** at which all matters that need to be resolved prior to trial, including matters set at in Rule 7.12.09, paragraphs D and E, shall be before the court. In their MSCR Statements Counsel are to address the following:

1. **Witnesses.** A list identifying all lay and expert witnesses the party intends to call at trial;
2. **Exhibits.** A list identifying all exhibits the party intends to offer at trial.
3. **Jury Instructions.** A Jury Instructions checklist indicating the BAJI numbers of requested Instructions;
4. **Photographs and Reports.** Each party shall attach to the MSRC Statement copies of relevant documents which may assist the Court in settlement including photographs, diagrams, reports, bills, and contracts.

No later than three days prior to the MSRC, the parties are to file and serve Motions in Limine.

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO.:                    FAX NO.*(Optional):*

E-MAIL ADDRESS *(Optional):*

ATTORNEY FOR *(Name):*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

   STREET ADDRESS:

   MAILING ADDRESS:

   CITY AND ZIP CODE:

   BRANCH NAME:

   PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| *(Check one):* ☐ **UNLIMITED CASE**   ☐ **LIMITED CASE** <br> (Amount demanded    (Amount demanded is $25,000 <br> exceeds $25,000)    or less) | |

**A CASE MANAGEMENT CONFERENCE is scheduled as follows:**

Date:                    Time:              Dept.:          Div.:            Room:

Address of court *(if different from the address above):*

☐ Notice of Intent to Appear by Telephone, by *(name):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. Party or parties *(answer one):*
   a. ☐ This statement is submitted by party *(name):*
   b. ☐ This statement is submitted jointly by parties *(names):*

2. Complaint and cross-complaint *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date):*
   b. ☐ The cross-complaint, if any, was filed on *(date):*

3. Service *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not):*

      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names):*

      (3) ☐ have had a default entered against them *(specify names):*

   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served):*

4. Description of case
   a. Type of case in ☐ complaint ☐ cross-complaint    *(Describe, including causes of action):*

Form Adopted for Mandatory Use <br> Judicial Council of California <br> CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court, <br> rules 3.720-3.730 <br> www.courts.ca.gov

Martin Dean's <br> ESSENTIAL FORMS™

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.  b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request  ☐ a jury trial  ☐ a nonjury trial.  *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐ The trial has been set for *(date):*
b.  ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*
c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐ days *(specify number):*
b.  ☐ hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial  ☐ by the attorney or party listed in the caption  ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  E-mail address:
☐ Additional representation is described in Attachment 8.
f.  Fax number:
g.  Party represented:

9.  **Preference**
☐ This case is entitled to preference *(specify code section):*

10.  **Alternative dispute resolution (ADR)**
a.  ADR information package. Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.
(1)  For parties represented by counsel: Counsel  ☐ has  ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.
(2)  For self-represented parties: Party  ☐ has  ☐ has not reviewed the ADR information package identified in rule 3.221.
b.  Referral to judicial arbitration or civil action mediation (if available).
(1)  ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under of Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.
(2)  ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
(3)  ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

CM-110 [Rev. July 1, 2011]                    **CASE MANAGEMENT STATEMENT**                    Page 2 of 5

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. c.    Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in (check all that apply and provide the specified information):

| | The party or parties completing this form are willing to participate in the following ADR processes (check all that apply): | If the party or parties completing this form in the case have agreed to participate in or have already completed an ADR process or processes, indicate the status of the processes (attach a copy of the parties' ADR stipulation): |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for (date):<br>☐ Agreed to complete mediation by (date):<br>☐ Mediation completed on (date): |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for (date):<br>☐ Agreed to complete settlement conference by (date):<br>☐ Settlement conference completed on (date): |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for (date):<br>☐ Agreed to complete neutral evaluation by (date):<br>☐ Neutral evaluation completed on (date): |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for (date):<br>☐ Agreed to complete judicial arbitration by (date):<br>☐ Judicial arbitration completed on (date): |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for (date):<br>☐ Agreed to complete private arbitration by (date):<br>☐ Private arbitration completed on (date): |
| (6) Other (specify): | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for (date):<br>☐ Agreed to complete ADR session by (date):<br>☐ ADR completed on (date): |

ESSENTIAL FORMS™

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

11. **Insurance**
   a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:
   b. Reservation of rights: ☐ Yes ☐ No
   c. ☐ Coverage issues will significantly affect resolution of this case *(explain)*:

12. **Jurisdiction**
   Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
   ☐ Bankruptcy ☐ Other *(specify)*:
   Status:

13. **Related cases, consolidation, and coordination**
   a. ☐ There are companion, underlying, or related cases.
      (1) Name of case:
      (2) Name of court:
      (3) Case number:
      (4) Status:
      ☐ Additional cases are described in Attachment 13a.
   b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party)*:

14. **Bifurcation**
   ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

15. **Other motions**
   ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

16. **Discovery**
   a. ☐ The party or parties have completed all discovery.
   b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

   Party          Description                                          Date

   c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify)*:

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20.** Total number of pages attached *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____          ▶ _____
(TYPE OR PRINT NAME)                                      (SIGNATURE OF PARTY OR ATTORNEY)

_____          ▶ _____
(TYPE OR PRINT NAME)                                      (SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

Martin Dean's
ESSENTIAL FORMS™